FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 15 2009

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> $183,791.00 IN UNITED STATES CURRENCY, <br><br> Defendant. | CIVIL ACTION No. <br><br> 1:06-CV-2791-JEC |

## ORDER AND OPINION

This case is presently before the Court on the Government's Motion to Reconsider [40] the Court's ruling on the Government's Motion for Summary Judgment [25] and the Government's Motion for Extension of Time to File the Consolidated Pretrial Order [35]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that the Government's Motion to Reconsider [40] should be **GRANTED,** the Government's Motion for Summary Judgment [25] should be **GRANTED,** and the Government's Motion for Extension of Time [35] should be **DENIED as moot.**

## BACKGROUND

This is a civil forfeiture case. On May 17, 2006, DEA agents seized $183,791 from Robinson Okwuosa ("claimant") at Atlanta's

Hartsfield-Jackson International Airport. (Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") [25] at 1.) The Government contends that the seized money represents drug proceeds. (*Id.*) It has filed this action for forfeiture under 21 U.S.C. § 881(a)(6). (Compl. [1].)

As noted in the Court's prior summary judgment order, most of the facts surrounding the seizure are undisputed. On May 5, 2006, claimant made a reservation with KLM Airlines for a round-trip ticket from Atlanta to Lagos, Nigeria, via Amsterdam. (Claimant's Statement of Material Facts ("Claimant's SMF") [28] at ¶ 1.) Claimant completed his outgoing journey to Nigeria without major incident, except that his flight was unexpectedly rerouted through Detroit. (*Id.* at ¶¶ 2-4.)

On May 15th, claimant completed the first leg of his return trip to Atlanta, arriving at Amsterdam as scheduled. (*Id.* at ¶ 5.) Following several unanticipated changes to his travel plans, claimant was prepared to catch the KLM flight from Amsterdam to Atlanta on May 17th. (*Id.*) Prior to his flight, claimant informed the Dutch Airport Authority that he was carrying a large amount of United States currency. (*Id.* at ¶ 9.) The Airport Authority contacted the Dutch police, who spoke with claimant about the money he was carrying. (Claimant's SMF [28] at ¶ 11.) The Dutch police did not seize the money, but they advised claimant that, in the future, he

2

should carry documentation to demonstrate a legitimate source for the money. (*Id.* at ¶ 12.) Claimant subsequently boarded flight # 621 from Amsterdam to Atlanta. (*Id.*)

Shortly thereafter, DEA agent Gregory Malloy was advised of claimant's travel itinerary, and that claimant was transporting a large amount of United States currency. (Pl.'s SMF [25] at ¶ 18.) Malloy relayed the information concerning claimant to Agent Mike Richardson of Immigration and Customs Enforcement ("ICE"). (*Id.* at ¶ 19.) Richardson called Inspector Anthony Carswell of the Department of Homeland Security, Customs and Border Protection ("CBP") in Atlanta. (*Id.* at ¶ 20.) Richardson asked Carswell to look for claimant on KLM flight # 621 when it arrived in Atlanta. (*Id.* at ¶ 22.)

When KLM flight # 621 arrived at the Atlanta airport, Inspector Carswell and fellow CBP Inspector Chris Murl met claimant at the gate where the flight was deplaning. (*Id.* at ¶ 23.) The inspectors asked claimant for his passport and his CBP Form 6059B, which is a form given to all incoming international passengers that requires passengers to declare whether they are carrying over $10,000 in currency. (Pl.'s SMF [25] at ¶¶ 24-25.) Claimant's Form 6059B indicated that he was carrying more than $10,000 in United States currency. (*Id.* at ¶ 27.) The inspectors allowed claimant to leave the gate area, but followed him to baggage claim. (*Id.* at ¶ 28.)

3

In the baggage claim area, the inspectors approached claimant again and asked to speak to him. (*Id.* at ¶ 30.) Claimant agreed to accompany the inspectors to an inspection area for an interview. (*Id.*) During the interview, the inspectors asked claimant how much money he was carrying. (Pl.'s SMF [25] at ¶ 31.) Claimant responded that he had between $175,000 and $190,000 on his person. (Claimant's SMF [28] at ¶ 27.) Claimant informed the inspectors that he was in the business of exporting cars for sale in Nigeria, and that the money in his possession was proceeds from car sales in Nigeria that he intended to use to purchase additional cars in the United States. (*Id.* at ¶ 30.)

When the inspectors asked to see the currency, claimant removed a large amount of money from the inside of his pants legs, the waist area of his pants, and his carry-on bag. (Pl.'s SMF [25] at ¶ 36-37.) The inspectors determined that claimant was carrying a total of $183,791. (*Id.* at ¶ 39.) After claimant corrected his Form 6059B to reflect the exact amount of currency he was carrying, the inspectors returned the $183,791 to claimant, and allowed him to leave the international concourse. (*Id.* at ¶¶ 41-42.)

Outside the international concourse, DEA agents Malloy and Richardson approached claimant and identified themselves. (*Id.* at ¶ 43.) Claimant agreed to speak with the agents. (*Id.* at ¶ 44.) During his subsequent interview, claimant repeated much the same

4

story that he had told the CBP inspectors: that he earned his living by exporting cars from the United States for sale in Nigeria and that the $183,791 was proceeds from the sale of vehicles in Nigeria, to be used to purchase vehicles in the United States. (Pl.'s SMF [25] at ¶ 45.) Claimant added that he was carrying cash because it was costly and difficult to arrange a wire transfer from a Nigerian bank. (*Id.* at ¶ 64.)

Following his initial interview, claimant accompanied Malloy and the other agents to the ICE office inside the airport. (*Id.* at ¶ 66.) Officer Jesse Burden of the East Point Police Department brought his narcotics detection dog "Bailey" to the ICE office to conduct a sniff of the $183,791. (*Id.* at ¶ 67.) During the sniff, Bailey alerted to the odor of narcotics on claimant's carry-on bag, which contained the currency. (*Id.* at ¶ 69.) Following the alert, Agent Malloy seized the currency as drug proceeds. (Pl.'s SMF [25] at ¶ 70.)

Claimant subsequently filed a petition for remission with the DEA. (*Id.* at ¶ 55.) In support of his petition, claimant produced receipts for cars sold at Liquid Cars and Carmax Auto in Nigeria, which claimant testified made up part of the seized currency. (*Id.* at ¶ 55.) Claimant also produced bank records, bills of lading, and other documents purporting to show that the money in his possession on May 17th was generated from Nigerian car sales. (*Id.* at ¶¶ 60-62,

5

74.)

During the ensuing investigation, the Government confirmed that claimant owns Bobby Imports, a sole proprietorship located in Norcross, Georgia that buys cars in the United States and exports them to Nigeria for sale. (*Id.* at ¶¶ 46-47.) However, the Government was not satisfied that claimant's financial records and other documentation demonstrated that the $183,791 seized on May 17th represented legitimate business proceeds. (Pl.'s SMF [25] at ¶¶ 72-110.) Accordingly, the Government filed this action for forfeiture of the currency. (Compl. [1].)

The Government subsequently filed a motion for summary judgment, which the Court denied. (Order [33].) In its order, the Court noted that the record contained several pieces of evidence suggesting that claimant was involved in some type of illegal activity, including: (1) claimant's traveling from Amsterdam to Atlanta with $183,791 in cash, which a narcotics detection dog alerted to as having been in contact with a controlled substance and (2) claimant's highly suspect tax and bank records. (*Id.* at 23-24.) However, the Court found that the evidence was insufficient to show that the $183,791 was subject to forfeiture as a matter of law. (*Id.* at 24.)

The Government has filed a motion to reconsider the summary judgment ruling based on newly discovered evidence. (Pl.'s Mot. to Reconsider [40].) That motion, as well as the Government's related

motion for an extension of time to file the consolidated pretrial order, is presently before the Court.

## **DISCUSSION**

### I. The Government's Motion to Reconsider

Local Rule 7.2(E) authorizes a motion for reconsideration when "absolutely necessary." LR 7.2(E) NDGa. A motion for reconsideration is not an appropriate mechanism to set forth new theories of law, or introduce new evidence, unless the evidence was previously unavailable. *Mays v. U.S. Postal Serv.*, 122 F.3d 43, 46 (11th Cir. 1997). Likewise, parties cannot use a motion for reconsideration to "relitigate old matters" or "raise argument[s] . . . that could have been raised" earlier. *Michael Linet, Inc. v. Vill. of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005). However, reconsideration may be necessary where there is: "(1) newly discovered evidence; (2) an intervening development or change in controlling law; or (3) a need to correct a clear error of law or fact." *Bryan v. Murphy*, 246 F.Supp. 2d 1256, 1258-59 (N.D. Ga. 2003) (Martin, J.) (citations omitted).

The Government's motion for reconsideration is based on newly discovered evidence linking claimant to a Nigerian drug trafficking organization, the members of which were recently indicted in the Northern District of Georgia. (Pl.'s Mot. to Reconsider [40] at 2.) The evidence, which was developed during the investigation preceding

AO 72A
(Rev.8/82)

the indictment, is highly probative of the forfeiture issue that is central to this case. (*Id.* at 7-12.) All of the evidence was obtained after the Government filed its motion for summary judgment. (*Id.* at 3.) Because it was a grand jury matter, the Government was barred from advising the Court of the evidence until the indictment was unsealed on September 10, 2008. (*Id.*)

Given the previous unavailability of the evidence, and its obvious relevance, the Government's motion fits within the narrow scope of appropriate motions for reconsideration under Local Rule 7.2(E). *See Bryan,* 246 F. Supp. 2d at 1258-59. Accordingly, the Court **GRANTS** the Government's motion to reconsider. The Court will reconsider the Government's motion for summary judgment in light of both the evidence initially submitted in support of the motion, and the newly discovered evidence.

## II. The Government's Motion for Summary Judgment

### A. Summary Judgment Standard

Summary judgment is appropriate "if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."" FED. R. CIV. P. 56(c). A fact's materiality is determined by the controlling substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine when the evidence is such that a

AO 72A
(Rev.8/82)

reasonable jury could return a verdict for the nonmovant. *Id.* at 249-50.

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, there can be "'no genuine issue as to any material fact,'" as "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Id.* at 322-23 (quoting FED. R. CIV. P. 56(c)).

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323. However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the movant has carried his burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating "'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.

While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (1986).

### B. Civil Forfeiture Standard

The civil forfeiture provision of the Controlled Substances Act provides that:

> The following shall be subject to forfeiture to the United States and no property right shall exist in them:
>
>> All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

21 U.S.C. § 881(a)(6). Section 881(a)(6) supports the "drug proceeds theory" of forfeiture that the Government asserts in this case. *See United States v. $242,484.00*, 389 F.3d 1149, 1160 (11th Cir. 2004) (discussing § 881(a)(6)) and *United States v. Real Prop. In Section 9, Town 29 N., Range 1 W., Twp. of Charlton, Otsego County, Mich.*, 308 F.Supp. 2d 791, 806 (E.D. Mich. 2004) (applying § 881(a)(6) to a

"proceeds" case).

Before the enactment of the Civil Asset Forfeiture Reform Act ("CAFRA") in 2000, the Government was only required to show "probable cause" to believe that seized property was subject to forfeiture. *See $242,484.00,* 389 F.3d at 1160 (applying the pre-CAFRA civil forfeiture standard). To avoid forfeiture, the claimant was required to rebut the Government's evidence, or demonstrate an applicable defense, by a preponderance of the evidence. *United States v. Carrell,* 252 F.3d 1193, 1201 (11th Cir. 2001). *See also Real Prop. In Section 9,* 308 F.Supp. 2d at 806.

The CAFRA evened the playing field, providing that:

In a suit or action brought under any civil forfeiture statute for the civil forfeiture of any property--

(1) the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture;. . .

18 U.S.C. § 983(c)(1). Pursuant to the CAFRA, the Government now has the initial burden of showing by a preponderance of the evidence that the property is subject to forfeiture. *See United States v. One 28 Foot Contender Motor Vessel,* 240 Fed. Appx. 842, 843 (11th Cir. 2007) (discussing the Government's heightened burden of proof under CAFRA).

In deciding forfeiture cases, the Eleventh Circuit has eschewed an overly mechanical approach, endorsing "a common sense view to the realities of normal life applied to the totality of the

11

circumstances." *$242,484.00,* 389 F.3d at 1160. In meeting its initial burden, the Government may rely on circumstantial evidence, as well as evidence gathered during the follow-up investigation to the seizure. *Id.* See also 18 U.S.C. § 983(c)(2)(authorizing the use of post-seizure evidence). In addition, the Government need not show a relationship between the seized property and a particular drug transaction--only that the property was related to some illegal drug transaction. *$242,484.00,* 389 F.3d at 1160. Nevertheless, the Government is only entitled to summary judgment if the evidence is so one-sided that it authorizes only one conclusion; that is, that the seized property more likely than not constitutes drug proceeds. *See United States v. One 1991 Chevrolet Corvette*, 390 F.Supp.2d 1059, 1065 (S.D. Ala. 2005)(discussing the interplay between the post-CAFRA forfeiture standard and the summary judgment standard).

**C. The Evidence Supporting Forfeiture In This Case**

In its prior order, the Court found substantial evidence in the record suggesting that claimant was involved in some sort of illegal activity. (Order [33] at 11-24.) The fact that claimant boarded a plane from Amsterdam to Atlanta with $183,791 in cash on his person and in his carry-on bag is in itself significant. (*Id.* at 12.) As the Court pointed out, most law-abiding wage earners do not carry such large sums of cash. (*Id.*) "They don't, because there are better, safer means of transporting cash if one is not trying to hide

12

it from the authorities." *$242,484.00*, 389 F.3d 1149 at 1161. "The same is not true of drug rings, which commonly do utilize couriers to transport in cash their ill gotten gains, which can be huge." *Id.*

In addition, a narcotics detection dog alerted to the currency that was seized from claimant. (*Id.* at 19-21.) As the Court explained in its order, there are some studies suggesting that most United States currency in general circulation has been contaminated by narcotics. (*Id.* at 20.) The alert is thus insufficiently conclusive, in and of itself, to warrant summary judgment. (Order [33] at 21.) Nevertheless, it is an important piece of evidence that unquestionably bolsters the Government's case for forfeiture. (*Id.*)

Finally, claimant's tax returns and bank records are extremely suspect. (*Id.* at 18.) According to claimant's official returns, his adjusted gross income was $802 in 2003, $422 in 2004, and negative $2,079 in 2005. (*Id.*) Those figures are incongruent with claimant's bank records, which show deposits of approximately $1.8 million between 2003 and 2006.[1] (*Id.* at 17.) Indeed, based on his own testimony, it is fairly clear that claimant has at the very least violated several provisions of the Internal Revenue Code by failing to claim all of the money that he earned through his business, Bobby Imports. (Order [33] at 18.)

---

[1] Claimant admitted that he did not file a return for 2006. (Order [33] at 18.)

13

In spite of the above evidence, the Court concluded that a reasonable jury could find that the $183,791 seized from claimant on May 17, 2006 was not subject to forfeiture under § 881(a)(6). (*Id.* at 24.) That conclusion was based on the lack of any evidence, besides the dog alert, linking claimant or the seized currency to a drug-related transaction or organization. (*Id.*) Although the evidence in the record strongly suggested that claimant was involved in some type illegal activity, it did not conclusively establish that the currency seized from claimant was subject to forfeiture under the "drug proceeds theory" asserted by the Government. (*Id.*) Accordingly, the Court denied the Government's motion for summary judgment. (*Id.*)

The newly discovered evidence that the Government has now produced more than adequately addresses the evidentiary deficiency that the Court noted in its initial summary judgment ruling. After the Government filed its motion for summary judgment, it became aware of the DEA's investigation of a Nigerian heroin ring operating in Atlanta and Detroit, Michigan. (Pl.'s Mot. to Reconsider [40] at 3.) During the course of that investigation, DEA Special Agent Robert Norton, the lead case agent in Atlanta, obtained evidence linking claimant and his business, Bobby Imports, to the heroin ring. (*Id.*) Agent Norton has submitted an affidavit describing the heroin ring and claimant's connection to it. (*Id.* at Ex. A.) His testimony is

14

powerful evidence that the $183,791 seized from claimant represents drug proceeds, as required by § 881(a)(6).

The background facts surrounding Agent Norton's testimony are as follows. In May, 2007, Norton identified Raymond Nsoedo as the leader of an Atlanta-based heroin trafficking organization. (Norton Aff. [40] at ¶ 4.) From his subsequent investigation, Norton learned that Nsoedo's organization was importing heroin into the United States via various airports and transporting the heroin to Detroit, where it was sold. (*Id.* at ¶ 12.) The proceeds from the heroin sales were then sent to Atlanta in the form of cash or blank money orders, and used to purchase vehicles to be shipped to Nigeria. (*Id.*) Once in Nigeria, the vehicles were sold for Nigerian naira, thereby transporting the proceeds from the sale of heroin in the United States to Nigeria without being detected by law enforcement officials. (*Id.*)

Nsoedo recruited a number of different individuals to sell heroin in Detroit, and to transport the proceeds from those sales to Atlanta to purchase cars for resale in Nigeria. (*Id.* at ¶ 5.) These individuals frequently carried large amounts of United States currency into the country. (Norton Aff. [40] at ¶ 13.) They used the cash to purchase blank money orders in the Detroit and Southfield area of Michigan. (*Id.* at ¶ 14.) The money orders were purchased in a "structured" manner, i.e., in increments of less than $3,000 per

15

day or from multiple clerks or locations over several days, in an attempt to avoid the reporting requirements of 31 U.S.C. § 5325(a). (*Id.* at ¶¶ 14-16.) The money orders were then sent to various individuals in Atlanta, who used them to purchase vehicles through their businesses to ship to Nigeria. (*Id.* at ¶ 18.)

During the course of his investigation, Agent Norton obtained a substantial amount of evidence linking claimant and his business, Bobby Imports, to Nsoedo's organization. (*Id.* at ¶¶ 18-26.) In February, 2008, Norton identified Bobby Imports as an additional business used to purchase vehicles on behalf of the organization. (Norton Aff. [40] at ¶ 18.) On two separate occasions in March, 2008, Norton intercepted telephone calls between Nsoedo and other individuals in his organization referring to claimant. (*Id.* at ¶¶ 21-22.) In one of those calls, Nsoedo asked another individual whether and where he had seen "Bro Robinson." (*Id.* at ¶ 22.) In the same phone call, Nsoedo discussed Robinson's "tractor business" and claimant's plan to return to the United States in April, 2008. (*Id.* at ¶ 22.) Claimant admits that he is the "Robinson" referred to in Nsoedo's phone calls. (Claimant's Resp. to Pl.'s Mot. to Reconsider [45] at 8.) He concedes, further, that Nsoedo was aware of his travel plans, and that he traveled from Amsterdam to Atlanta on April 24, 2008, on the same flight he had taken at the time the currency was seized on May 17, 2006. (*Id.*)

Claimant's bank records further link him to the Nsoedo organization. (Pl.'s Mot. to Reconsider [40] at Ex. C.) Those records show that Bobby Imports was the remitter of money orders totaling at least $6,000, which were made payable to Valu-Auto, Inc., one of Nsoedo's companies. (Id.) The money orders were purchased in the same structured fashion that was typically used by members of the Nsoedo organization. (Id.) Other records obtained during Agent Norton's investigation indicate that claimant has deposited into his various bank accounts more than $530,000 in money orders, most of which were purchased in the Detroit area in the structured manner typically used by members of the Nsoedo organization. (Id. at ¶ 26.)

Nsoedo's bank records further show that claimant wrote at least two checks directly to Nsoedo during the relevant time period, one for $4,810 and one for $105. (Norton Aff. [40] at ¶ 25.) In addition, on at least two occasions in March of 2005, claimant deposited into his various bank accounts money orders totaling $6500 and $5500 from remitter Christopher Okoye. (Id. at ¶¶ 3, 26.) Okoye is a known affiliate of Nsoedo who was arrested in Detroit in May, 2007 in connection with the delivery of five kilograms of heroin from New York. (Id.)

Finally, several documents in claimant's possession at the time of the seizure suggest that claimant regularly used another of Nsoedo's companies, Atlantic Imports, to ship vehicles to Nigeria.

17

(*See* Malloy Aff. [25] and attached exhibits.) In fact, claimant stated at his deposition that Atlantic Imports acted as his "agent" for exporting certain vehicles. (Robinson Dep. at 87.) The relevance of that testimony was not apparent until Nsoedo was indicted for using businesses like Bobby Imports to transport drug proceeds to Nigeria.

Although claimant submitted a response to the Government's motion to reconsider, his response does not contain any evidence to refute Agent Norton's testimony. (Claimant's Resp. to Pl.'s Mot. to Reconsider [45].) When considered alongside the other evidence in the record, Norton's uncontroverted testimony meets the Government's burden of showing, by a preponderance of the evidence, that the $183,791 seized from claimant on May 17, 2006 is subject to forfeiture under § 881(a)(6). Based upon the evidence in the record, no reasonable jury could find otherwise. Accordingly, on reconsideration in light of newly discovered evidence, the Government's motion for summary judgment [25] is **GRANTED**.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Government's Motion to Reconsider [40], **GRANTS** the Government's Motion for Summary Judgment [25], and **DENIES as moot** the Government's Motion for an Extension of Time to File the Consolidated Pretrial Order [35].

18

SO ORDERED, this 15 day of September, 2009.

                                        /s/ Julie Carnes
                                        JULIE E. CARNES
                                        CHIEF UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)